# CASES

# SUPREME COURT OF ALABAMA.

## NOVEMBER TERM, 1898.

## Baker *v.* The State.

### *Indictment for Murder.*

1. *Jury law; statute providing for drawing of jury a general and not a special law.*—The act approved February 28, 1887, (Acts of 1886-87, p. 151) "to more effectually secure competent and well qualified jurors in the several counties of this State," is a general and not a local or special law, notwithstanding the exclusion of some counties from its operation; and its several provisions being embodied in the Code of 1896, were re-enacted by the adoption of said Code, and being, therefore, *in pari materia*, must be construed together.

2. *Same; failure to comply with directory provisions not reversible error.*—Where statutory regulations in regard to the organization of juries are made by statute purely directory, a failure to comply with such regulations is not reversible error.

3. *Organization of jury; failure to state on lists of jurors their occupation, does not authorize quashing of venire.*—Under the provisions of section 4997 of the Code, no objection will be sustained to a venire for a petit jury, except for fraud in drawing and summoning the jurors; and, therefore, a failure on the part of the jury commissioners, making the list of names drawn for the jury, to state opposite the names the occupation of each of said jurors, as provided by section 4982 of the Code, is no ground for quashing the venire; such provision being directory merely.

4. *Same; not necessary for jury to be drawn day before case is set for trial.*—The jury law does not require a special venire, from which the jury to try a capital case is to be impannelled, to be drawn one day before such case is set for trial.

5. *Same; regular jury for the week can be included in special venire,*

[Baker v. The State ]

Where an order for the drawing of a special venire, from which a jury to try a capital case is to be impannelled, is made the week previous to the one in which the trial is to be had, it is not erroneous to make the juries summoned for the week in which the case is set for trial, a part of the special venire.

6. *Homicide; when evidence as to turbulent character of deceased inadmissible.*—On a trial under an indictment for murder, where there is no evidence of a rencounter between the deceased and his assailant, and there is no question as to who was the aggressor in the difficulty, evidence that the deceased was of a turbulent and blood-thirsty character is wholly irrelevant and inadmissible.

7. *Same; admissible evidence.*—On a trial under an indictment for murder, the fact that another person than the defendant had a difficulty with the deceased prior to the homicide, and was arrested on a charge of having killed him, does not tend to show such other person was guilty of the homicide charged in the indictment, and that the defendant was innocent.

8. *Evidence; witness incompetent to testify to facts inferred by him.*—Where a witness has testified to a certain fact, and upon cross-examination it is disclosed that such testimony was merely a conclusion on the part of the witness, or mere reference from certain things having happened, such testimony should, upon motion, be excluded; the mere opinion of the witness or inferences drawn by him from certain facts not being admissible in evidence.

9. *Trial and its incidents; argument of attorney.*—Where a defendant in a criminal case did not testify as a witness, it is improper for the prosecuting attorney in his argument before the jury, to comment upon the failure of the defendant to deny certain facts which were testified to on the trial.

APPEAL from the Circuit Court of Madison.

Tried before the Hon. H. C. SPEAKE.

The appellant in this case was indicted and tried for the murder of Joe McCloud, was convicted of murder in the first degree, and sentenced to the penitentiary for life.

The defendant was arraigned on February 22, 1899, which was the third week of the circuit court of Madison county, and the 27th of February, 1899, which was Monday of the fourth week was set for the trial of the cause; and 40 names were drawn from the jury box,

which, together with the panel of the petit jurors drawn and summoned for the fourth week of the court, was to constitute the venire from which the jury to try the defendant was to be selected.

When the cause was called for trial, the defendant made nine motions, which were as follows: 1. "Comes the defendant and moves the court to quash the venire summoned in said cause on the following grounds: 1st. Said venire was not drawn from a jury box that had been filled as was required by law. 2d. Said venire was drawn from a jury box illegally filled and the jury drawn to serve the fourth week of the term was drawn before the box had been filled, and at the same time that the grand jury was drawn, the jury commissioners determined among themselves which persons of the persons drawn should sit on the grand jury and which should sit on the petit jury. 3d. The names which were in the jury box at the time the jury commissioners began to fill the box were taken out and destroyed, and the venire of this case was drawn from the box so filled. 4th. The venire was drawn from a jury box filled by jury commissioners who knowingly disobeyed the directions and mandates of law particularly in this, that they did not prepare a list of the names selected by them, stating thereon the place of residence and occupation of each person, when known to them, and the slips on which the names of the persons mentioned in the list prepared by the jury commissioners does not show the occupation of a single person of the venire drawn in the case."

2. "Comes the defendant and moves the court to quash the venire of petit jurors for the term because the same was illegally drawn, in that the jury commissioners have failed to comply with the plain mandates of the law regulating the drawing of jurors by omitting to place upon the list and slips drawn by them, when filling the jury box and selecting said venire, the occupation of said jurors when known to them."

3. "Comes the defendant and moves the court to allow him or his attorneys to examine and inspect the jury box from which was drawn the venire in this case and that your honor will enter all proper orders necessary

to secure said privilege and the following ground is offered for said motion: 1st. The jury commissioners were guilty of fraud in that they sought to prefer their friends in the matter of selecting and drawing juries, and that their conduct was in violation of law and order."

4. "Comes the defendant, in proper person and by attorney, and moves the court to quash the special venire drawn for the trial of the above entitled cause and assigns as the grounds of said motion that said venire was not drawn according to the law prescribing the requirements for the drawing of venires in capital cases in that the jury commissioners failed or omitted to place upon the list drawn for petit jurors the occupations of each juror when known to them, and further failed or omitted to place the occupations of said jurors when known to them upon the slips in the regular jury box."

5. "Comes the defendant and moves to quash the venire summoned to try this case because a list of the jurors selected by the jury commissioners was not put in a sealed envelope and deposited in the office of the probate judge as required by law."

6. "Comes the defendant and moves the court to quash the indictment, because the grand jury that preferred the same was not drawn and empannelled according to the mandates and requirements of the law in this: that the jury commissioners when they began to fill the jury box destroyed all the names that were in the box at the time they began to fill the same, and at the time said grand jury was drawn the commissioners had not completed their work of filling said box. 2d. Because the jury commissioners did not place on the list prepared from which names were taken to fill the jury box, the occupation, when known to them, of each person as required by law. 3d. Said jury commission drew more than 21 names for grand jurors and from that list selected the names from which the grand jury was made up. 4th. The petit juries and grand juries were drawn at one and the same time, and the jury commissioners determined which jurors should serve on the grand jury and which should serve on the petit juries from the list

so drawn, or as the list was drawn."

7. "Comes the defendant and moves the court to quash the venire on the ground that the said venire was not drawn one day before the case was set for trial."

8. "Comes the defendant and moves the court to quash the venire on the ground that two of the jurors who were summoned to attend this court were excused from attending and sitting on the trial of this case in the absence of defendant and without his consent."

9. "Comes the defendant and moves the court to quash the venire on the ground that the jury organized for fourth week of the term is not the jury summoned and served on the defendant at least one day before the trial."

In compliance with the motion numbered 3, the court ordered the jury box to be brought into court and appointed and allowed the attorneys for the defendant to examine the same. On the hearing of the other motions, it was shown that the jury commissioners had failed to put on the slips of the lists of jurors drawn, the occupations of any of the persons drawn on the venire to try this case. As to the motion numbered 8, the proof showed that no jurors were excused, and the two jurors referred to in said motion were not excused, but their names were placed in the hat and were drawn therefrom, and the defendant passed on each of them. Each of the motions except the motion numbered 3, was overruled and disallowed, and to the ruling of the court in overruling each of said motions the defendant separately excepted.

The evidence for the State tended to show that Joe McCloud was killed by being shot with a gun, while riding along the public highway, near a place in the road where there was a cedar thicket on either side. There was no evidence of a difficulty between the deceased and his slayer.

One James B. White, a witness for the State, testified among other things that he saw the body of the deceased the morning after he was killed, lying on the public road where he fell; that upon looking for tracks they found what they took to be the tracks of the assassin, which led

more in the direction of the house of one Alex Lacey, than in the direction of the defendant's house. On cross-examination of this witness, he was asked by the defendant the following question: "Was not the deceased a fussy, turbulent, blood-thirsty character?" The solicitor for the State objected to this question, the court sustained the objection, and the defendant duly excepted. The said witness was then asked by the defendant: "Did not the deceased tell you of a difficulty which he had with Alex Lacey and of the bad feeling existing between them?" The State objected to this question, which objection the court sustained, and the defendant duly excepted. This witness was then asked by the defendant the following question: "Do you know whether Alex Lacey was arrested charged with this same offense?" The court sustained the State's objection to this question, and the defendant duly excepted.

Upon the examination of one of the State's witnesses, he was asked by the solicitor, "How far does the defendant's mother live from here?" The defendant objected to this question on the ground that it called for illegal and immaterial evidence, the court overruled the objection, and the defendant duly excepted.

Upon the examination of Jim McCloud, as a witness for the State, he testified that he knew the defendant and the defendant's father, and upon his further testifying that the father of the defendant owned a gun, the defendant moved to exclude the testimony of the witness as to the defendant's father having a gun, upon the ground that it was immaterial and incompetent evidence. The court overruled the objection and the defendant duly excepted.

Elijah Langford, a witness for the State, testified that on the night of the killing, the defendant came to his house about 10 or 11 o'clock and staid there all night; that the defendant told him that he had shot Joe Mc-Cloud along the public highway, and that he asked the witness to go to his wife's house and stay with his, the defendant's wife, until he came back. The mother of the witness, Elijah Langford, testified to the same facts. There was testimony introduced in behalf of the State

tending to show that after the killing the defendant fled from the community where he lived. The facts relating to the examination of the witness, Adolphus Love, in order to show the defendant's flight, are sufficiently shown in the opinion.

Upon the cross-examination of the sheriff and deputy sheriff of Madison county, the defendant asked each of them if it was not a fact that he had a warrant for the arrest of Alex Lacy charged with the killing of Joe Mc-Cloud. The solicitor for the State objected to each of these questions the court sustained the objection, and the defendant separately excepted. The defendant introduced several witnesses whose testimony impeached the State's witness, Elijah Langford. He also introduced evidence tending to show that his absence from home was caused by his having enlisted in the army. He introduced several witnesses who testified that his general character in the neighborhood where he lived was good, and that he was a peaceable, quiet and law-abiding citizen.

The bill of exceptions contains the following recital: "The solicitor in his oral argument to the jury said that 'the defendant did not deny having left his sick wife and fleeing the country.' To this reference the defendant duly excepted. The solicitor further stated that 'the defendant did not deny that he went to Elijah Langford's house and made the confession.' To this remark of the solicitor the defendant reserved an exception. The defendant duly excepted to the court's failure to reprimand the solicitor for such conduct and remarks."

The court at the request of the solicitor gave to the jury the following written charges: (1.) "The State is not bound to prove the guilt of the accused to the exclusion of a possibility of his innocence, but only to the satisfaction of the jury beyond a reasonable doubt. And in whatever form the question of reasonable doubt may be couched, and however it may be twisted by words, a reasonable doubt—is no more than a reasonable doubt—a doubt for which a reason can be given." (2.) "The jury owe it to the community to find the defendant guilty, if he is shown to be guilty beyond a

reasonable doubt." (3.) "The jury should not hesitate to find the defendant guilty, if from all the evidence he is shown to be guilty beyond a reasonable doubt." (4.) "Gentlemen, there is no law which says it is better for ninety-nine guilty persons to escape than that one innocent one shall suffer. The policy of the law simply is the guilty shall be punished, and the innocent go free, and not that it is better for the guilty to escape than for the innocent to suffer."

. The defendant separately excepted to the giving of each of these charges, and also separately excepted to the court's refusal to give each of the following charges requested by him: (1.) "If the jury believe the evidence, they must find the defendant not guilty." (2.) "Unless the State has shown a motive or reason why the defendant should have killed the deceased, the jury should not be quick to accept the evidence as true, especially when the evidence is not corroborated by evidence other than the confession." (3.) "If under the evidence, the jury believe that Alex Lacey could have been guilty of the offense charged, then they should find the defendant not guilty." (4.) "There is no legal evidence before you that George Baker's wife was sick, and the solicitor's statement that she was sick is not justified by the evidence." (5.) "It is not necessary for the defendant to prove the guilt of Alex Lacey beyond a reasonable doubt. If it is shown from the evidence that there is a rational probability that Alex Lacey did take the life of the deceased, then they should find the defendant not guilty." (6.) "If Elijah Langford testified that he had no conversation with Lee Baker on the 22d day of February, 1899, and the jury believe that he did have a conversation with Lee Baker, and that he went with Lee Baker to David A. Grayson's office, then this is a circumstance which will authorize the jury to disregard the entire evidence of the witness Langford." (7.) "If the jury believe that Elijah Langford did not tell Adam Morris, on Tuesday morning, January 24th, 1899, of the alleged confession to him of George Baker, this fact may be sufficient to generate a reasonable doubt of the truth of any criminating circumstance to which the said

[Baker v. The State.]

Langford may have testified." (8.) "It is not necessary for the defendant to prove the guilt of Alex Lacey beyond a reasonable doubt; if it is shown from the evidence that there is a probability that Alex Lacey did take the life of the deceased, then they should find the defendant not guilty." (9.) "If the jury believe that there was a state of bad feeling between the deceased and Alex Lacey, and that tracks supposed to have been made by the slayer of the deceased, found leading in a manner in the direction of Alex Lacey's home; from these facts the jury may think that probably Alex Lacey might have committed the murder, and if they so believe, this is a just foundation for a reasonable doubt." (10.) "If the State has failed to prove beyond a reasonable doubt that Joe McCloud was killed by a shot gun, then they will find the defendant not guilty." (11.) "If the jury believe that the witness Mary Jane McComb and Elijah Langford swore to contradictory statements, this may be sufficient to cause them to disregard the evidence of Mary Jane McComb and Elijah Langford."

D. A. GRAYSON and W. B. BANKHEAD, for appellant. The jury law which obtains in Madison county is the act set out in the note on page 132 of the Criminal Code of 1886. Said act is a local act, because its provisions do not apply to the entire territory under the jurisdiction of Alabama, nor does it apply to all the people of the same class. The jury act found copied on page 132, Criminal Code of 1886, is a local law, has not been repealed, and its provisions are mandatory.—*Faust . v. Huntsville*, 83 Ala. 279; *Davis v. State*, 68 Ala. 64; *Maxwell v. State*, 89 Ala. 150; *Steele v. State*, 111 Ala. 33.

The remarks of the solicitor in his argument before the jury were prejudicial to the defendant, and the court erred in not reprimanding the solicitor for making them.—*Stone v. State*, 105 Ala. 65.

CHAS. G. BROWN, Attorney General, for the State. The court did not err in refusing to grant the motions to quash the venire.—*Cotton v. State*, 87 Ala. 75; *Green v. State*, 97 Ala. 59; *Scales v. State*, 96 Ala. 69; *Toliver*

*v. State,* 94 Ala. 111; *Allen v. State,* 111 Ala. 80 ; Code of 1896, § § 4333, 4997, 5269; *State v. Simons,* 10 So. Rep. 382; *Linnehan v. State,* 116 Ala. 471; *McLeroy v. State,* 120 Ala. 274; *South v. State,* 86 Ala. 617.

The objection to the argument of counsel for the State has not been properly reserved for review in the appellate court.—*Stone v. State,* 105 Ala. 72; *Rogers v. State,* 117 Ala. 9.

McCLELLAN, C. J.—The act of February 28th, 1887, "to more effectually secure competent and well qualified jurors in the several counties of this State," with a provision excepting from its operation certain named counties, (Acts 1886-7, pp. 151 *et seq.* Cr. Code, 1886, p. 132) was a *general* and not a local or special law: it applied in general terms to the State *excepting* certain counties, and not to certain counties designated by name to the exclusion of the State generally; and it was not within the saving clause of section 10 of the Code of 1896, but was a public law of a general and permanent nature which was superseded and repealed, or merged by or in the Code provisions covering the same subject found in Chapter 166 of the Criminal Code of 1896, (§ § 4976 *et seq.*) ; and this trial was had under the present Code and not under said act of 1887. The objections taken by defendant's motions numbered 1, 2, 4, 5, and 6 are emasculated by section 4997 of the Code to the effect that the provisions of the statute invoked by the motion are directory merely.—*Thompson v. State, infra,* p. 12; *Childress v. State, infra, p.* 21.

The law does not require that the venire should be drawn one day before the case *is set* for trial. Motion 7 was, therefore, without merit.

Nor did the law require in this case that the jury *organized* for the fourth week should compose, in part, the special venire. The regular jurors *summoned* for that week—the order for special venire being made the previous week—were properly made part of the special

venire. Motion No. 9 was, therefore, bad.

It affirmatively appears by the bill of exceptions that the averments of motion 8 were untrue. It, of course, was properly disallowed.

It appeared on the trial that deceased was waylaid at night and shot to death from ambush. At least there was no evidence of a rencounter between him and his assailant, and no question as to aggression on his part in the case. That he may have been a "turbulent and blood thirsty character" was wholly irrelevant and impertinent.

The facts that deceased and one Lacy had had a difficulty and that Lacy had been arrested on the charge of having killed him did not legitimately tend to show that Lacy, and not this defendant, was guilty of the homicide charged in this indictment.

The witness Adolphus Love was examined to show defendant's flight. To this end he was allowed to testify that "the father of defendant is my tenant. Defendant worked with his father last year." Here the State, against defendant's objection, was allowed to put this question to the witness: "Had not George Baker [defendant]made arrangements with you to make a crop this year?" To this the witness answered that he had. Defendant's motion to exclude this answer was overruled. On cross-examination, defendant asked this question: "How do you know that the defendant had made arrangements to make a crop this year?" The witness answered that "he knew it because the father of the defendant had thrown back on him a one-horse crop some time after the defendant left the country." Thereupon the defendant moved to exclude all the testimony of this witness in regard to the contract that the defendant or his father made with the witness, on several grounds. The motion should have been granted. It is very clear that the testimony as to defendant having made arrangements with him to make a crop the current year was purely the conclusion—the merest inference—of the witness; and both that part of his testimony and his reference to the tenancy of defendant's father which was linked to the case only by this inference, should

have been excluded. The witness plainly demonstrated that he *knew* nothing about defendant having made any such arrangement. Nor was this testimony lacking in prejudicial tendency. That the defendant left the country is not disputed; but whether his departure was flight was a matter of inference for the jury. The natural effect of this testimony—going, as it did, to show that he left in January after having made arrangements to remain during the year—was to strengthen the idea of flight in the minds of the jurors.

As the case is now presented we do not see the pertinency of the testimony as to the distance defendant's mother lived from him, or as to defendant's father having a gun.

We find no error in the other rulings of the court on the competency of testimony, nor in its action upon charges requested.

The remarks of the solicitor to the effect that "the defendant did not deny having left his sick wife, and fleeing the country," and that "the defendant did not deny that he went to Elijah Langford's house and made the confession," were improper, the defendant not having testified as a witness in the case; but it does not appear that the court's action in respect of them was invoked or had.

Reversed and remanded.